[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Nelson*, Slip Opinion No. 2020-Ohio-3690.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2020-OHIO-3690

THE STATE OF OHIO, APPELLEE, *v.* NELSON, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Nelson*, Slip Opinion No. 2020-Ohio-3690.]

*Determination whether a community-control violation is a "technical violation"*
 *under R.C. 2929.15(B)(1)(c) does not turn on whether the conduct at issue*
 *is criminal.*

(No. 2019-0049—Submitted January 28, 2020—Decided July 15, 2020.)

APPEAL from the Court of Appeals for Champaign County,

No. 2018-CA-5, 2018-Ohio-4763.

_____

**O'CONNOR, C.J.**

{¶ 1} This appeal concerns the sentence that was imposed on defendant-appellant, John Edward Nelson, for violating the conditions of his community control.  We hold that Nelson's violation of the condition that he obey all orders of his supervising officer was not a "technical violation" and therefore the 180-day

cap on a prison sentence for a "technical violation" in R.C. 2929.15(B)(1)(c)(ii) does not apply. We affirm the judgment of the Second District Court of Appeals.

## I. Relevant Background

{¶ 2} Nelson was indicted on eight counts of drug and forgery charges. In July 2016, he pleaded guilty to four of the drug charges—Count 5 (trafficking in cocaine), Count 6 (attempted aggravated trafficking in drugs), and Counts 7 and 8 (corrupting another with drugs). All four were fourth-degree felonies. He was sentenced to four years of community control.

{¶ 3} Nelson's community control included both standard and special conditions. Three of the standard conditions are relevant here—the first, second, and fifth standard conditions. The first standard condition required Nelson to "obey federal, state and local laws and ordinances." The second standard condition required Nelson to "follow all orders given to [him] by [his] supervising officer or other authorized representatives of the Court or the Department of Rehabilitation and Correction." Relevant to this case, in June 2017, Nelson's supervising officer, Officer Herbert Nicholson, ordered Nelson not to have any contact with Jamie Elliott. The fifth standard condition required him to "conduct [himself] as a responsible, law abiding citizen." Finally, the judgment entry also warned Nelson that if he violated the terms of his community control, he would be sentenced to 34 months in prison.[1]

{¶ 4} In January 2018, the trial court held a community-control-revocation hearing based on allegations that Nelson had violated the three community-control conditions noted above. The alleged violations stemmed from an incident that

---

1. Specifically, the trial court's entry states that the court would sentence Nelson to 17 months in prison for each of the four drug charges to which he had pleaded guilty. The sentences on Counts 5 and 6 would be served concurrently, as would the sentences on Counts 7 and 8. But the 17-month concurrent sentences for Counts 5 and 6 would be served consecutively to the 17-month concurrent sentences for Counts 7 and 8, resulting in a total sentence of 34 months in prison.

occurred on December 23, 2017, at the house of Nelson's aunt. Nelson testified at the hearing, as did Nicholson and Nelson's aunt.

{¶ 5} Nelson had been living with his aunt, but he had been gone for a couple days leading up to December 23 because she did not allow drinking in the house and had asked him to leave. On the afternoon of December 23, Nelson had been drinking with Elliott and was intoxicated when he went back to the house he shared with his aunt. But because he was intoxicated, his aunt told him to leave and come back the next day. Nelson left, but he returned soon thereafter to get clothes because he was cold. He was locked out, however, and according to his aunt, he was "screaming" and "yelling profanity," demanding to be let in. Nelson kicked the door, and it cracked open four or five inches. Nelson then shut the door and walked away. His aunt called the police, who found him walking down the street and arrested him. Nelson was subsequently convicted of criminal damaging in the Champaign County Municipal Court.

{¶ 6} The trial court found that Nelson's actions violated three standard community-control conditions. Specifically, Nelson violated the first standard condition, requiring him to obey all state laws, by "caus[ing] damage to property." Nelson violated the second standard condition, requiring him to obey all orders given to him by his supervising officer, by having contact with Elliott in December 2017. Finally, Nelson violated the fifth standard condition, requiring him to conduct himself as a responsible, law-abiding citizen, by acting in a disorderly manner. As a result of these violations, the trial court revoked Nelson's community control and imposed the 34-month aggregate prison sentence it had warned Nelson he would face for a community-control violation at his initial sentencing hearing in 2016.

{¶ 7} Nelson appealed to the Second District Court of Appeals. He argued that his prison sentence should not have exceeded 180 days, pursuant to R.C. 2929.15(B)(1)(c)(ii). That provision states that "[i]f the conditions of a community

control sanction are violated," the sentencing court may sentence the offender to a prison term, subject to the following limitation:

> If the prison term is imposed for any technical violation of the conditions of a community control sanction imposed for a felony of the fourth degree that is not an offense of violence and is not a sexually oriented offense or for any violation of law committed while under a community control sanction imposed for such a felony that consists of a new criminal offense and that is not a felony, the prison term shall not exceed one hundred eighty days.

R.C. 2929.15(B)(1)(c)(ii). Nelson argued that each of his three violations was either a misdemeanor or a "technical violation" of his community control and that therefore, the maximum prison sentence he could receive for those violations was 180 days.

{¶ 8} The Second District rejected that argument. It focused on whether Nelson's violation of the second standard condition—that he comply with Nicholson's no-contact order—constituted a "technical violation" of his community control, and it concluded that it did not.[2] It followed the approach taken in two courts of appeals decisions that considered whether community-control violations were "technical violations," *State v. Davis*, 12th Dist. Warren No. CA2017-11-156, 2018-Ohio-2672, and *State v. Mannah*, 5th Dist. Fairfield No. 17-CA-54, 2018-Ohio-4219. Those cases found a violation to be a nontechnical violation when the condition violated was "specifically tailored to address and treat

---

2. The trial and appellate courts appear to have assumed that Nelson's other community-control violations were misdemeanor-level conduct and therefore each constituted a "violation of law * * * that is not a felony" under R.C. 2929.15(B)(1)(c)(ii). We express no opinion on the correctness of that determination.

[the defendant's] substance abuse issues," and when it was "a substantive rehabilitative requirement which addressed a significant factor contributing to [the defendant's] criminal conduct." *Davis* at ¶ 17, 18; *see also Mannah* at ¶ 10, 12, and 15 (following *Davis*). A technical violation, by contrast, those courts explained, was more akin to "an administrative requirement facilitating community control supervision." *Davis* at ¶ 18; *see also Mannah* at ¶ 12 and 15 (following *Davis*).

**{¶ 9}** Based on this distinction, the Second District found that the no-contact order issued under the second standard condition had been specifically tailored to Nelson and that Nelson himself had admitted that "drinking alcohol was his 'main problem,' and that Elliott's use of alcohol around him contributed to his drinking and his violations of community control." 2018-Ohio-4763, 124 N.E.3d 450, ¶ 32. The Second District therefore held that the violation was not a "technical violation," meaning Nelson's prison sentence was not capped at 180 days by R.C. 2929.15(B)(1)(c)(ii). It affirmed his sentence.

**{¶ 10}** Nelson appealed to this court, raising one proposition of law: "The caps on community-control-violation prison sentences for underlying, qualified fourth- and fifth-degree felonies apply to all community-control violations that are based upon conduct that does not constitute a felony-level crime."[3] We accepted jurisdiction. 155 Ohio St.3d 1412, 2019-Ohio-1205, 120 N.E.3d 30.

---

3. Similar to the cap contained in R.C. 2929.15(B)(1)(c)(ii) that Nelson argues applies to him because his community-control sanction was imposed for felonies of the fourth degree, R.C. 2929.15(B)(1)(c)(i) contains a provision placing a cap on prison sentences when the community-control sanction was imposed for a felony of the fifth degree. It provides that "[i]f the prison term is imposed for any technical violation of the conditions of a community control sanction imposed for a felony of the fifth degree or for any violation of law committed while under a community control sanction imposed for such a felony that consists of a new criminal offense and that is not a felony, the prison term shall not exceed ninety days."

## II. Analysis

{¶ 11} "The interpretation of a statute is a question of law, and accordingly, we review the matter de novo." *State v. Vanzandt*, 142 Ohio St.3d 223, 2015-Ohio-236, 28 N.E.3d 1267, ¶ 6.

### A. *The Meaning of "Technical Violation" in R.C. 2929.15(B)(1)(c)(ii)*

{¶ 12} Nelson argues that the 180-day cap on prison sentences applies to all community-control violations that are not felonies. In support, he points to the language in the statute applying the cap to all violations that are either a "technical violation" or a "violation of law * * * that is not a felony." Nelson also asserts that this court has "long defined the term 'technical violation' to mean non-criminal conduct in the parole context," citing this court's decision in *State ex rel. Taylor v. Ohio Adult Parole Auth.*, 66 Ohio St.3d 121, 124, 609 N.E.2d 546 (1993).

{¶ 13} In *Taylor*, we considered an inmate's argument that he had been entitled to but had not received a parole-revocation hearing within 60 days of being taken into custody. We quoted a federal circuit court's statement that technical violations of parole are " 'violations of the terms and conditions of the parole agreement which are not criminal in nature, such as failure to report to the parole officer, association with known criminals, leaving employment, leaving the State, etc.' " *Taylor* at 124, quoting *Inmates' Councilmatic Voice v. Rogers*, 541 F.2d 633, 635 (6th Cir.1976), fn. 2. According to Nelson, this is the meaning of the term "technical violation" for the purposes of community control under R.C. 2929.15(B)(1)(c). And, he argues, it must be presumed that when the General Assembly enacted subsection R.C. 2929.15(B)(1)(c)(ii) in 2017, 2017 Am.Sub.H.B. No. 49 ("H.B. 49"), it understood that this court's definition of "technical violation" would apply to that subsection. *See Wayt v. DHSC, L.C.C.*, 155 Ohio St.3d 401, 2018-Ohio-4822, 122 N.E.3d 92, ¶ 23 ("the legislature is presumed to have full knowledge of prior judicial decisions").

{¶ 14} Finally, Nelson argues that this court should interpret R.C. 2929.15(B)(1)(c)(ii) in his favor because doing so would further the clear purpose of the subsection, which was to reduce the number of low-level offenders in state prisons, *see State v. Neville*, 2019-Ohio-151, 128 N.E.3d 937, ¶ 30 (8th Dist.) (discussing the purpose of the criminal-sentencing amendments in H.B. 49).

{¶ 15} The state argues that the Second District's interpretation of R.C. 2929.15(B)(1)(c)(ii), based on the distinction drawn in *Davis*, 2018-Ohio-2672 (12th Dist.), and *Mannah*, 2018-Ohio-4219 (5th Dist.), is correct. It also argues that *Taylor* supports its view of the statute because the examples of a technical violation provided therein—failure to report to parole officer, association with known criminals, leaving employment, leaving the state, *Taylor*, 66 Ohio St.3d at 124, 609 N.E.2d 546—are all "minor violations of administrative requirements facilitating community control." Furthermore, it argues that viewing the term "technical" as having a different meaning than "noncriminal" is consistent with the notion, stated by the Eighth District in *Neville*, that "the General Assembly intended to allow the judge to retain some discretion when faced with more serious violations that do not rise to the level of a crime," *id.* at ¶ 49.

{¶ 16} The Ohio Prosecuting Attorneys Association filed an amicus brief in support of the state in which it asserts that a nontechnical violation does not need to be a felony in order to avoid the caps on prison sentences contained in R.C. 2929.15(B)(1)(c). It notes a number of dictionary definitions of the term "technical" suggesting that a "technical violation" is one that is minor or de minimis.

{¶ 17} We agree with the state. "When analyzing statutory provisions, our paramount concern is to ascertain and give effect to the intention of the General Assembly." *Vanzandt*, 142 Ohio St.3d 223, 2015-Ohio-236, 28 N.E.3d 1267, at ¶ 7. "We primarily seek to determine legislative intent from the plain language of a statute. * * * 'If the meaning of the statute is unambiguous and definite, it must

be applied as written and no further interpretation is necessary.' " *Id.*, quoting *State ex rel. Savarese v. Buckeye Local School Dist. Bd. of Edn.*, 74 Ohio St.3d 543, 545, 660 N.E.2d 463 (1996).

{¶ 18} The term "technical violation" is not defined in the statute. "In the absence of a definition of a word or phrase used in a statute, words are to be given their common, ordinary, and accepted meaning." *State v. Black*, 142 Ohio St.3d 332, 2015-Ohio-513, 30 N.E.3d 918, ¶ 39. To this end, we observe that prominent legal dictionaries define "technical" as immaterial and not substantive. For example, *Black's Law Dictionary* defines "technical" as "[i]mmaterial, not affecting substantial rights, without substance." *Black's Law Dictionary* 1463 (6th Ed.1990). Similarly, "technical" is defined in *Ballentine's Legal Dictionary and Thesaurus* as "[i]nvolved in detail or in form rather than in a principle or in substance." Lynton, *Ballentine's Legal Dictionary and Thesaurus* 661 (1995).

{¶ 19} The distinction drawn in *Davis* and *Mannah* comports with the plain and ordinary meaning of "technical violation." In *Davis*, the defendant had been required to participate in a program at a community-based correctional facility to address his substance-abuse issues. *Id.*, 2018-Ohio-2672, at ¶ 3. The defendant voluntarily checked himself out of the program before he completed it, and the court considered whether that constituted a technical violation of his community control. *Id.* at ¶ 4, 10. It found that the violation was nontechnical because the condition had been "specifically tailored to address and treat [the defendant's] substance abuse issues" and the condition was "a substantive rehabilitative requirement which addressed a significant factor contributing to [the defendant's] criminal conduct." *Id.* at ¶ 17, 18. In contrast, the court noted that a technical violation was more akin to "an administrative requirement facilitating community control supervision." *Id.* at ¶ 18. *Mannah* involved a defendant who had asked to be unsuccessfully terminated from a community-based correctional-facility program, in violation of her community control. *Id.*, 2018-Ohio-4219, at ¶ 3. The

court in *Mannah* applied the same distinction drawn by the Twelfth District in *Davis*. *Mannah* at ¶ 15.

{¶ 20} We also find that the interpretation of the term "technical violation" in *Davis* and *Mannah* makes sense when R.C. 2929.15 is viewed as a whole and that Nelson's interpretation—that "technical violation" means any noncriminal violation—does not. As we have previously noted, "words in a statute do not exist in a vacuum. We must presume that in enacting a statute, the General Assembly intended for the entire statute to be effective. * * * Thus, all words should have effect and no part should be disregarded." *D.A.B.E., Inc. v. Toldeo-Lucas Cty. Bd. of Health*, 96 Ohio St.3d 250, 2002-Ohio-4172, 773 N.E.2d 536, ¶ 19; *see also State v. Bryant*, __ Ohio St.3d __, 2020-Ohio-1041, __ N.E.3d __, ¶ 17 ("We read words in a statute in the context of the whole statute").

{¶ 21} R.C. 2929.15 concerns community-control sentences. Subsection (B)(1) sets out the sanctions that may be imposed on an offender who violates the terms of his community control, and subsections (B)(1)(c)(i) and (ii) place caps on the length of sentences for community-control violations when the underlying crime was a fourth-or fifth-degree felony. The caps apply in two circumstances: one, when the violation conduct was a "technical violation" and two, when the conduct was "any violation of law committed while under a community control sanction imposed for [a fourth- or fifth-degree] felony that consists of a new criminal offense and that is not a felony." R.C. 2929.15(B)(1)(c)(i) and (ii). Interpreting "technical violation" to encompass all noncriminal conduct would effectively result in the caps applying to all violation conduct that is not a felony. But if the General Assembly had intended such a result, it would not have needed to mention "technical violations" at all. It could have stated in one simple provision that the caps apply whenever the violation conduct is not a felony. *See Mannah* at ¶ 14 (if the legislature had intended the caps to apply to all noncriminal violations, "it could have specifically stated so in the statute"). It did not do so. "Thus, the

choice of the term 'technical' implies it has meaning distinct from 'non-criminal' violations." *Id.* at ¶ 14.

{¶ 22} The language enacted by the General Assembly indicates its intent to limit the trial court's discretion in imposing a sentence for a less serious violation (i.e., a "technical violation") by capping the prison term that may be imposed for such a violation at 180 days while leaving the trial court with greater discretion in imposing a sentence for a more serious violation, even though that conduct may not be criminal. *See Neville*, 2019-Ohio-151, 128 N.E.3d 937, at ¶ 49 (the term "technical violation" indicated the statute was "intended to allow the judge to retain some discretion when faced with more serious violations that do not rise to the level of a crime"). The distinction drawn in *Davis* and *Mannah* reflects this understanding and allows a trial court to exercise such discretion. As the Twelfth District put it in *Davis*, interpreting the caps to apply to all noncriminal conduct "would effectively strip a trial court of its inherent authority to determine whether a violation of the terms and conditions of community control constitutes a technical violation." *Davis*, 2018-Ohio-2672, at ¶ 13. Like the *Davis* court, we "doubt the legislature intended such a result," *id*.

{¶ 23} The approach taken in *Davis* and *Mannah* also enables a practical application of the statute by the trial court. Trial courts are presented with many different types of noncriminal community-control violations, the severity of which varies greatly. In *Neville*, for example, the Eighth District had before it a defendant who had failed to report to her supervising officer for over three months. It analogized the case to *Davis* and *Mannah* and held that the violation was nontechnical. *Neville* at ¶ 44-47. In particular, it stated that although the defendant's failure to report may have constituted a technical violation if it had happened only once, the violation was nontechnical because the defendant had failed to report at all for over three months. *Id.* at ¶ 48. This highlights that under *Davis* and *Mannah*, a trial court may find a violation to be more serious—and

10

therefore nontechnical—based in part on the *manner* in which the violation of the community-control condition occurred; it is not constrained to reviewing only the nature of the condition itself.

{¶ 24} Finally, Nelson's argument relying on our statements in *Taylor*, 66 Ohio St.3d 121, 124, 609 N.E.2d 546, concerning the meaning of "technical violation" is not persuasive, because the statements in *Taylor* must be read in context. The petitioner in *Taylor* was an inmate arguing that he had not received a final parole-revocation hearing within a reasonable time. As part of his argument that such a hearing was required within 60 days after he was taken into custody, he pointed to a contempt order issued by a federal district court in *Inmates' Councilmatic Voice v. Wilkinson*, N.D.Ohio No. C72-1052 (Jan. 21, 1992), requiring such hearings within 60 days. We observed, however, that the order in *Wilkinson* applied the 60-day rule only to parole violations that were "technical violations" and that the United States Court of Appeals for the Sixth Circuit had, in a footnote, defined "technical violation" for purposes of the contempt order to mean " 'those violations of the terms and conditions of the parole agreement which are not criminal in nature, such as failure to report to the parole officer, association with known criminals, leaving employment, leaving the State, etc.' " *Taylor* at 124, quoting *Rogers*, 541 F.2d at 635, fn. 2. Based on those observations, we rejected Taylor's argument because not all of his violations were "technical violations."

{¶ 25} *Taylor* is of limited value here. First, the case involved parole revocation, not community-control revocation. So the statutory scheme we consider here was neither considered nor relevant in *Taylor*. Second, in *Taylor*, the term "technical violation" was not contained in the language of a statute. The term came up only because it was used in a federal court's contempt order. Third, even if one ignores these two concerns, *Taylor* did not attempt to define the term "technical violation." It simply quoted the Sixth Circuit's interpretation of the term—which the Sixth Circuit had set out in a footnote, citing no authority—in the

11

course of rejecting the petitioner's argument. We therefore decline to place any significant weight on the statements from *Taylor* on which Nelson relies.

{¶ 26} We agree with the approach taken in *Davis* and *Mannah* regarding the interpretation of the term "technical violation" in R.C. 2929.15(B)(1)(c). That interpretation is consistent with the plain meaning of the term and makes sense when the term is considered in the context of the statute as a whole. We therefore hold that the determination whether a violation is a "technical violation" under R.C. 2929.15(B)(1)(c) does not turn on whether the conduct at issue is criminal. As *Davis* indicated, a violation is "nontechnical" if, considering the totality of the circumstances, the violation concerns a condition of community control that was "specifically tailored to address" matters related to the defendant's misconduct or if it can be deemed a "substantive rehabilitative requirement which addressed a significant factor contributing to" the defendant's misconduct. *Davis*, 2018-Ohio-2672, at ¶ 17, 18; *see also Black's* at 1463 (defining "technical" as "[i]mmaterial, not affecting substantial rights, without substance"). On the other hand, a violation is "technical" when the condition violated is akin to "an administrative requirement facilitating community control supervision." *Davis* at ¶ 18; *see also Ballentine's* at 661 (defining "technical" as "[i]nvolved in detail or in form rather than in a principle or in substance"). There is no single factor that determines whether a violation is technical or nontechnical. As indicated above, the statute allows the trial court to engage in a practical assessment of the case before it, i.e., to consider the nature of the community-control condition at issue and the manner in which it was violated, as well as any other relevant circumstances in the case.

{¶ 27} Had the General Assembly wanted to enact a different rule governing caps on prison sentences for community-control violations, it could have done so. Overall, the plain language of the statute does not support Nelson's interpretation. We therefore reject Nelson's argument that all noncriminal violations constitute "technical violation[s]" under the statute.

*B. Whether Nelson's Violation Was a "Technical Violation"*

{¶ 28} We now consider whether Nelson's conduct constituted a "technical violation" under R.C. 2929.15(B)(1)(c)(ii). As noted above, in imposing community control, the trial court ordered that Nelson be subject to a standard condition that he "follow all orders given to [him] by [his] supervising officer or other authorized representatives of the Court or the Department of Rehabilitation and Correction." Nicholson subsequently ordered Nelson not to have any contact with Elliott.

{¶ 29} The state argues that Nicholson's no-contact order was a substantive rehabilitation requirement that had been specifically tailored to Nelson in light of the role such contact had played in his past misconduct. Considering the totality of the circumstances, we agree. We therefore hold that his violation was not a "technical violation."

{¶ 30} Nelson has served six prior terms of imprisonment and was on postrelease control for a violent felony offense at the time he committed the drug-related felonies leading to the community-control sentences in the present case. Given Nelson's criminal history, Nicholson may have believed that issuing specifically tailored orders under the second standard condition was particularly important to Nelson's overall success on community control.

{¶ 31} Nicholson testified that he gave the no-contact order at issue in this case when he learned, in June 2017, that Nelson had been drinking with Elliott at her house when he got into a dispute with her neighbor. The dispute apparently involved a knife. After Nicholson investigated the matter, he ordered Nelson not to have any contact with Elliott. He also told Nelson that he believed Elliott was a bad influence who would cause him to be at risk for violating his community control.

{¶ 32} Nelson's own testimony makes clear that this order was a substantive rehabilitation requirement. Nelson acknowledged that he had a

problem with alcohol and that alcohol was "a gateway" to his misconduct. Once he starts drinking, he stated, "that opens the door to everything else." He also told Nicholson that socializing with Elliott had been a contributing factor to his drinking, and he agreed that Elliott "was contributing to [his] violation of community control." Finally, Nelson admitted that alcohol was a contributing factor to his actions on December 23, 2017.

{¶ 33} In light of the foregoing, we find that Nelson's violation of the no-contact order was not a "technical violation" of the terms of his community control. Applying the standard described above, the no-contact order was "specifically tailored to address" Nelson's substance-abuse issues. *See Davis*, 2018-Ohio-2672, at ¶ 17. It was not a mere "administrative requirement facilitating community control supervision" but rather was "a substantive rehabilitative requirement which addressed a significant factor contributing to" Nelson's misconduct. *See id.* at ¶ 18. And the circumstances surrounding the violation make clear that this was not a minor infraction; it was significant. When the trial court revoked Nelson's community control, it noted that Nelson's disregard of Nicholson's no-contact order and his consumption of alcohol were "risk factors that jeopardized his pro-social behavior." Furthermore, the trial court noted that Nelson's violation of the no-contact order led to his actions on December 23, 2017, which resulted in a conviction for a misdemeanor.

{¶ 34} Consequently, we hold that Nelson's violation of the second standard condition was not a "technical violation" under R.C. 2929.15(B)(1)(c)(ii). As a result, we hold that the trial court was not limited to sentencing Nelson to a maximum of 180 days in prison.

### III. Conclusion

{¶ 35} For these reasons, we affirm the decision of the Second District.

Judgment affirmed.

KENNEDY, FRENCH, FISCHER, and DEWINE, JJ., concur.

14

DONNELLY, J., dissents, with an opinion joined by STEWART, J.

_____

**DONNELLY, J., dissenting.**

{¶ 36} The majority does not bring any clarity to the meaning of "technical violation," as the phrase is used in R.C. 2929.15(B)(1)(c)(ii), by pitting dicta from a lone 27-year-old case against a generic dictionary definition of the adjective "technical." In the specific context of community control, parole, and probation, a "technical violation" connotes a violation of supervision terms that is not in itself a criminal offense. When defendant-appellant, John Edward Nelson, maintained contact with his girlfriend, Jamie Elliot, contrary to a verbal order by his supervising officer, he committed a "technical violation" of the terms of his community control that was punishable by no more than 180 days in prison. Because the majority concludes otherwise, I dissent.

{¶ 37} Pursuant to R.C. 2929.15(B)(1), a trial court has the discretion to impose a prison term "[i]f the conditions of a community control sanction are violated" or "if the offender violates a law." For offenders, like Nelson, whose community-control sanctions are based on fourth-degree felony convictions, the prison term cannot exceed 180 days if it "is imposed for any technical violation of the conditions of a community control sanction" or for a violation of the law "that consists of a new criminal offense * * * that is not a felony," R.C. 2929.15(B)(1)(c)(ii).

{¶ 38} Nelson was sentenced to almost three years in prison for being around his girlfriend. Nelson's having contact with his girlfriend was not a crime, nor was it a violation of any special conditions of his community control, including the special condition forbidding Nelson to have contact with specified people: "Calub Hackney, Charles Fugitt, Jennifer Smith, Mitchell McCoy, [and] Robert McClorey." His actions violated only the standard condition to follow the orders of a supervising officer. His actions could have been considered a "technical

violation," but because the officer indicated during Nelson's revocation hearing that the verbal order was an *important* order, the majority places Nelson's violation in a new category it calls "nontechnical violation."

{¶ 39} Just as criminal violations are divided into misdemeanors and felonies for separate treatment under R.C. 2929.15(B)(1)(c)(ii), the majority sees noncriminal violations as being divided into technical and nontechnical violations. Pursuant to the majority's division of noncriminal violations, a judge should feel free to send people to prison for up to six months for any trivial, de minimus violations of community-control terms and to send people to prison for years upon years if they violate terms that a supervising officer deems, after the violation, to be important.

{¶ 40} With this understanding of R.C. 2929.15(B)(1)(c)(ii), almost every single person currently on community control could immediately be thrown in prison for six months or more. As for Nelson, he could get a 34-month prison term for violating his community control if he commits murder *or* if he talks to a woman who his supervising officer thinks is bad news, but he could get no more than a 180-day prison term if he commits arson under R.C. 2909.03(D)(2)(a) (a first-degree misdemeanor) *or* if he does not have a job (that is, so long as the supervising officer does not assert at the revocation hearing that the job requirement was important). This result is absurd. It eviscerates the prison-term limitation created in R.C. 2929.15(B)(1)(c)(ii), 2017 Am.Sub.H.B. No. 49 (a budget bill), and it thwarts a main purpose of the subsection—lowering incarceration costs to Ohio taxpayers by reducing the number of low-level offenders in the state prison system. *See* Gary C. Mohr, director of the Ohio Department of Rehabilitation and Correction, Testimony in Support of H.B. 49, House Finance Committee, February 14, 2017, available at http://search-prod.lis.state.oh.us/cm_pub_api/api/unwrap /chamber/132nd_ga/ready_for_publication/committee_docs/cmte_h_finance_1/tes

timony/cmte_h_finance_1_2017-02-14-0900_85/garymohr_02.14.17.pdf (accessed June 28, 2020) [https://perma.cc/KBG6-8U3C].

{¶ 41} The majority justifies its technical-nontechnical dichotomy by keeping to a plain-meaning approach and relying on a definition of the adjective "technical" that uses the descriptors, " '[i]mmaterial, not affecting substantial rights, without substance,' " majority at ¶ 18, quoting *Black's Law Dictionary* 1463 (6th Ed.1990). But an acontextual definition of the word "technical" in *Black's* does not bring us any closer to the meaning of the phrase "technical violation" in the specific context of community control, parole, and probation. *See Fed. Communications Comm. v. AT & T, Inc.*, 562 U.S. 397, 405-406, 131 S.Ct. 1177, 179 L.Ed.2d 132 (2011) (parsing of the word "personal" does not dictate the meaning of the word when it is included in the phrase "personal privacy"). Further, the more contemporary editions of *Black's* do not contain an entry for the word "technical." *See Black's Law Dictionary* (11th Ed.2019); *Black's Law Dictionary* (10th Ed.2014); *Black's Law Dictionary* (9th Ed.2009); *Black's Law Dictionary* (8th Ed.2004). What the most recent editions do include, though, is an entry for the term "technical-meaning exception," *Black's* at 1765 (11th Ed.) and *Black's* at 1692 (10th Ed.), which applies here to explain why merely looking to the ordinary meaning of the word "technical" in this case, is not helpful.

{¶ 42} The technical-meaning exception is an exception to the rule that an undefined term in a legal instrument should be understood as having its ordinary, everyday meaning. The exception applies for any term that "has acquired a specialized or peculiar meaning in a given context and appears in that context." *Black's* at 1765 (11th Ed.). "It is established law in Ohio that, where a word has a technical definition differing from its dictionary definition, it shall be construed according to the former." *Youngstown Sheet & Tube Co. v. Lindley*, 56 Ohio St.2d 303, 309, 383 N.E.2d 903 (1978); *see also* R.C. 1.42.

{¶ 43} In the specific context of parole and probation violations, the term "technical violation" has been defined as a "violation that does not consist of commission of a crime" and is referred to as "technical" "to indicate that it is behavior forbidden by the conditions of parole [or probation] and not by statute." *Ferdico's Criminal Law and Justice Dictionary* 315, 349, 432 (1992). Although I believe that this specialized definition alone adequately refutes the majority's plain-language position, I do not wish to merely engage in a war of the dictionaries. For that reason, I am providing an overview of the use of the term "technical violation" in jurisprudence and academic literature to demonstrate that the commonly held understanding of the term is consistent with the definition in *Ferdico's*.

{¶ 44} In the 1950s, Pennsylvania state and federal courts started using the term "technical violator" to mean someone who has committed a violation of the terms of his or her parole other than by committing a new crime. *See, e.g., Commonwealth ex rel. Neiswender v. Dressell*, 89 Pa.D.&C. 106, 107-108, 1954 WL 4581 (Pa.C.P.1954); *United States ex rel. Bogish v. Tees*, 211 F.2d 69, 71 (3d Cir.1954). From the 1950s through the 1970s, the term "technical violation" began to appear in the opinions of other state and federal courts in reference to parole and probation violations that were not themselves crimes. *See, e.g., State v. Moretti*, 50 N.J.Super. 223, 243-244, 141 A.2d 810 (1958); *State ex rel. Johnson v. Follette*, 58 Misc.2d 474, 477, 295 N.Y.S.2d 565 (1968); *State v. Spaulding*, 119 Ill.App.2d 310, 313, 256 N.E.2d 157 (1970); *In re Tucker*, 5 Cal.3d 171, 204, 95 Cal.Rptr. 761, 486 P.2d 657 (1971); *Inmates' Councilmatic Voice v. Rogers*, 541 F.2d 633, 635 (6th Cir.1976); *United States ex rel. Baker v. Finkbeiner*, 551 F.2d 180, 184 (7th Cir.1977); *State v. Rial*, 399 Mich. 431, 446, 249 N.W.2d 114 (1976); *Conner v. Griffith*, 160 W.Va. 680, 688, 238 S.E.2d 529 (1977); *McKeever v. State*, 359 So.2d 905, 906 (Fla.App.1978); *State v. Mortrud*, 89 Wash.2d 720, 724, 575 P.2d 227 (1978).

**{¶ 45}** And since the 1980s, the term has been widely used in this way throughout the country. *See, e.g., State v. Brown*, 387 So.2d 567, 569 (La.1980); *Mastrangelo v. United States Parole Comm.*, 682 F.2d 402, 405 (2d Cir.1982); *Price v. Oregon State Bd. of Parole*, 300 Or. 283, 290, 709 P.2d 1075 (1985), fn. 8; *Carchman v. Nash*, 473 U.S. 716, 737, 105 S.Ct. 3401, 87 L.Ed.2d 516 (1985), fn. 3 (Brennan, J., dissenting) (differentiating probation violations founded on new criminal convictions from "technical violations"); *State v. Hockensmith*, 413 N.W.2d 277, 279 (Minn.App.1987), *aff'd as modified,* 417 N.W.2d 630 (Minn.1988); *State v. Green*, 757 P.2d 462, 465 (Utah 1988), *superseded by statute on other grounds, as stated in State v. Wallace*, 2006 UT 86, 150 P.3d 540, ¶ 11; *State v. White*, 150 Vt. 132, 135, 549 A.2d 1069 (1988); *State v. Ojeda*, 159 Ariz. 560, 561, 769 P.2d 1006 (1989); *Johnson v. State*, 784 S.W.2d 75, 78 (Tex.App.1989); *State v. Graham*, 793 P.2d 600, 600-601 (Colo.App.1989); *Boulder v. Parke*, 791 S.W.2d 376, 377 (Ky.App.1990); *King v. Commonwealth*, 243 Va. 353, 369, 416 S.E.2d 669 (1992); *State ex rel. Taylor v. Ohio Adult Parole Auth.*, 66 Ohio St.3d 121, 124, 609 N.E.2d 546 (1993); *Thompson v. Crabtree*, 82 F.3d 312, 317 (9th Cir.1996); *Mohammed v. State*, 226 Ga.App. 387, 388, 486 S.E.2d 652 (1997), *disapproved of on other grounds by Bliss v. State*, 244 Ga.App. 160, 535 S.E.2d 251 (2000); *Henry v. State*, 714 So.2d 1002, 1005 (Ala.Crim.App.1998); *State v. Perez*, 269 Kan. 340, 342, 11 P.3d 52 (2000); *D'Ambrosio v. State*, 112 Haw. 446, 465, 146 P.3d 606 (2006), fn. 16; *Ferrell v. Carr*, W.D.Okla. No. Civ-07-0261-HE, 2007 WL 4591274, *5 (Dec. 28, 2007); *Commonwealth v. Pena*, 462 Mass. 183, 186, 967 N.E.2d 603 (2012), fn. 4; *Bloom v. State*, 128 Nev. 883, 381 P.3d 595 (2012); *Heaton v. State*, 984 N.E.2d 614, 618 (Ind.2013); *Jenkins v. Morgan*, 28 F.Supp.3d 270, 273, 280 (D.Del.2014); *Atwood v. State*, 183 So.3d 843, (Miss.2016), ¶ 6, fn. 1 (pursuant to statute); *Leniart v. Bundy*, D.Conn. No. 3:09CV9(HBF), 2017 WL 1020971, *5 (Mar. 16, 2017), fn. 9; *United States v. Banks*, 778 Fed.Appx. 694, 698 (11th Cir.2019); *State v. Simile*,

440 P.3d 306, 307 (Alaska App.2019) (pursuant to statute); *State v. Aslin*, 457 P.3d 249 (N.M.2019), ¶ 11 (pursuant to statute).

{¶ 46} In addition to the foregoing jurisprudence, the common understanding of "technical violation" reflected in contemporary academic discussions is that "[a] technical violation is a breach of the rules of release that is not in itself criminal."  Klingele, *Rethinking the Use of Community Supervision*, 103 J.Crim.L. & Criminology 1015, 1030-1031 (2013), fn. 76; *see also* Petersilia, *California Prison Downsizing and Its Impact on Local Criminal Justice Systems*, 8 Harv.L. & Policy Rev. 327, 345 (2014); Wool & Stemen, *Changing Fortunes or Changing Attitudes?  Sentencing and Corrections Reforms in 2003*, 16 Fed.Sent.R. 294, 297 (2004); Jones & Kerbs, *Probation and Parole Officers and Discretionary Decision-Making: Responses to Technical and Criminal Violations*, 71-JUN Fed. Probation 9 (2007); Kirages, *Reentry Reform in Indiana: HEA 1006 and Its (Much Too Narrow) Focus on Prison Overcrowding*, 49 Ind.L.Rev. 209, 234 (2015); Levine, *Too Many Prisoners: Undoing the Legacy of Getting Too Tough*, 96 Mich.B.J. 32, 33-34 (2017).

{¶ 47} The extensive historical usage of the term "technical violation" makes it clear that the phrase has a particular meaning in the context of community control, parole, and probation.  When a phrase such as "technical violation" has a specialized meaning, a parsing of the generic meaning of each individual word in the phrase is inappropriate.  *See Fed. Communications Comm.,* 562 U.S. at 405, 131 S.Ct. 1177, 179 L.Ed.2d 132, citing *Textron Lycoming Reciprocating Engine Div., AVCO Corp. v. United Auto. Workers*, 523 U.S. 653, 657, 118 S.Ct. 1626, 140 L.Ed.2d 863 (1998).  Accordingly, a "technical violation" is not a "minor or de minimis," majority opinion at ¶ 16, violation of community-control terms.  Rather, the specialized meaning of "technical violation," as the term is used in R.C. 2929.15(B)(1)(c)(ii), is a violation of community-control terms that is not in itself a criminal offense.

{¶ 48} The specialized meaning of "technical violation" in R.C. 2929.15(B)(1) makes sense in view of the subsection as a whole. Pursuant to R.C. 2929.15(B)(1) an offender may receive a prison term "[i]f the conditions of a community control sanction are violated" *or* "if the offender violates a law." It is standard for a prohibition against violating the law to be included in the conditions of a community-control sanction, R.C. 2929.17, so it is possible for a single act to constitute both a violation of community-control sanctions and a criminal offense. R.C. 2929.15(B)(1)(c)(i) and (ii) limit prison terms to 90 days (under subsection (i)) or 180 days (under subsection (ii)) for low-level offenders who have violated the terms of their community control by committing a "technical violation of the conditions of a community control sanction" or by committing "a new criminal offense * * * that is not a felony." These limitations have the effect of dividing violations into three categories: (1) noncriminal violations of terms included in an offender's community-control sanctions, which are subject to the 90- or 180-day cap, (2) misdemeanor offenses, whether or not they are specified in an offender's community-control sanctions, which are subject to the 90- or 180-day cap, and (3) felony offenses, which are not subject to the caps *even if* they are specified in an offender's community-control sanctions.

{¶ 49} Moreover, it makes sense to apply the specialized meaning of "technical violation" in R.C. 2929.15(B)(1) because applying that meaning allows the statute to be internally consistent and without conflicting or superfluous terms. R.C. 2929.15(B)(1) allows trial courts the discretion to impose prison sentences for noncriminal violations of community-control terms, but it limits the sentence that may be imposed to 90 or 180 days in order to keep prisons from being overpopulated with low-level offenders. The majority rejects this reading, however, based on the assertion that had that been what the General Assembly intended, it would have simply stated that the 90- and 180-day caps apply to any violation that is not a felony. But I know of no canon of statutory interpretation

that allows a court to upend the meaning of a statute just because the General Assembly has used cumbersome, inefficient language. We would be in the position to upend a good deal of the entire Revised Code if there were such a canon. Even if the majority is correct in assuming that its simplified hypothetical version of the language in R.C. 2929.15(B)(1)(c)(i) and (ii) would be without pitfalls or ambiguity, the fact that the General Assembly "could have drafted the statute differently does not negate the plain meaning of the statute as enacted," *United States v. LaFaive*, 618 F.3d 613, 618 (7th Cir.2010).

**{¶ 50}** Given the foregoing, it is clear that Nelson committed a "technical violation of the conditions of a community control sanction" under R.C. 2929.15(B)(1)(c)(ii) when he failed to heed his supervising officer's verbal order not to have contact with Jamie Elliot. The trial court had the discretion to impose a prison term for Nelson's violation, but that discretion was limited by the 180-day cap in the statute. Nelson's sentence exceeds the statutory limit, so the Second District Court of Appeals should have reversed the judgment of the trial court, vacated Nelson's sentence, and remanded for the trial court to impose a sentence of 180 days or less. Because the majority affirms the Second District's judgment affirming Nelson's sentence, I dissent.

STEWART, J., concurs in the foregoing opinion.

_____

Kevin S. Talebi, Champaign County Prosecuting Attorney, and Jane A. Napier, Assistant Prosecuting Attorney, for appellee.

Timothy Young, Ohio Public Defender, and Peter Galyardt, Assistant Public Defender, for appellant.

Paul A. Dobson, Wood County Prosecuting Attorney, and David T. Harold, Assistant Prosecuting Attorney, urging affirmance for amicus curiae, Ohio Prosecuting Attorneys Association.

_____